## MACEO TROY STREATER *v.* COMMISSIONER OF CORRECTION
### (AC 33159)

Beach, Sheldon and Mihalakos, Js.

Argued December 3, 2012—officially released June 4, 2013

*Stephanie L. Evans*, assigned counsel, for the appellant (petitioner).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David Clifton*, assistant state's attorney, for the appellee (respondent).

*Opinion*

MIHALAKOS, J. The petitioner, Maceo Troy Streater, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his third petition for a writ of habeas corpus. On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal, and that the court improperly (1) found the petitioner's claims of juror bias to be procedurally defaulted; (2) denied his claim of ineffective assistance of trial counsel; and (3) denied his claim of ineffective assistance of appellate counsel. We dismiss the appeal.

The petitioner's underlying conviction was the subject of a direct appeal before this court. See *State* v. *Streater*, 36 Conn. App. 345, 650 A.2d 632 (1994), cert. denied, 232 Conn. 908, 653 A.2d 195 (1995). In affirming the conviction, we concluded that the jury reasonably could have found the following relevant facts. On May 8, 1990, the victim was riding a bicycle in New Haven at approximately 9 p.m. Id., 347. The victim and two of his friends encountered an acquaintance, Joseph Preston; the victim and Preston separated from the others and rode their bicycles up Shelton Avenue. Id. Then, "[f]our young African-American males, including the [petitioner], approached [the victim] on foot. An argument ensued between [the victim] and the [petitioner], while Preston stood fifteen to twenty feet away. Preston recognized the [petitioner] and noted that he was wearing a white shirt and black pants. The argument between the victim and the [petitioner] continued and, at a time that Preston was looking the other way, Preston heard gunshots. When Preston turned, he saw the [petitioner]

standing in the middle of the street shooting at the [victim]. [The victim] died as a result of his injuries.

"The New Haven police were notified. Detective Joseph Howard observed the body of the victim lying in the street. . . . While Howard was canvassing the neighborhood for possible witnesses, Carol Cheek motioned him to the rear of a building, and provided him with information that led him to check outside the [petitioner's] home for a faded red compact car.

"Detectives Anthony DiLullo and John Greene were also dispatched to the shooting scene. . . . Howard called DiLullo and Greene over to his car to meet Cheek. Cheek told the officers that earlier in the evening she had heard gunshots and had seen four young African-American men running from the area where she had heard the shots. The men entered a faded red or maroon automobile parked on Dixwell Avenue. Cheek identified the [petitioner] as one of the men she had seen running. He lived across the street from her, and she had known him for about twenty years. Cheek also told the officers she had seen the [petitioner] with the maroon automobile on other occasions, and that it was normally parked outside his house on Dixwell Avenue. . . .

"Preston was contacted by the police several days later regarding the shooting. He reviewed a tray of photographs of African-American males and selected the [petitioner's] photograph as that of the person who had shot the victim.

"On May 10, 1990, DiLullo and Greene tape-recorded a statement from Cheek at her apartment. On May 16, Cheek met with the detectives to read and review her statement. She read and corrected her statement, initialed each correction and signed the last page.

"At trial,[1] Cheek testified that she did not remember being outside her house on May 8. She also stated that she did not approach Howard that night, that she did not recall whether she gave the police a taped statement on May 10, and that looking at the transcript of the statement did not help because she could not read. She acknowledged that the signature on the statement was hers, although she did not remember signing it. Cheek listened to the tape recording of the statement, but denied that the voice was hers.

"On cross-examination, Cheek said that two officers were putting pressure on her to provide information about the shooting. On redirect examination, although Cheek said she had no recollection of the events of May 8, she did recall trying to get herself and her children out of the way of gunshots." Id., 347–49.

The jury found the petitioner guilty of murder in violation of General Statutes § 53a-54a and carrying a pistol without a permit in violation of General Statutes § 29-35. Id., 346–47. The petitioner was sentenced to a total effective term of thirty-five years incarceration.

After this court affirmed the petitioner's conviction, the petitioner's sister met with Attorney John J. Kelly regarding representation of the petitioner in connection with preparing a petition for a new trial based on alleged newly discovered evidence. Kelly, however, did not file the petition for a new trial within the statute of limitations, and the petition was dismissed. Kelly then filed a petition for a writ of habeas corpus on the petitioner's behalf, in which he asserted the same arguments as he presented in the petition for a new trial. The court, *Downey, J.*, denied this petition in December, 1998. The petitioner filed a second habeas corpus petition in 1999,

---

[1] The petitioner's first trial on the same two counts ended in a mistrial. *State* v. *Streater*, supra, 36 Conn. App. 349 n.4. Unless otherwise specified, references herein to the petitioner's trial refer to his second trial.

which the court, *Silbert, J.*, dismissed without trial in July, 2002.

The petitioner then filed the present habeas corpus petition alleging claims of juror bias and ineffective assistance of counsel. Following the habeas trial, the court, *Fuger, J.*, denied the petition and subsequently denied the petitioner's petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal, and that the court erroneously rejected his claims that he was denied his right to a fair and impartial jury, and received ineffective assistance of trial and appellate counsel. We are not persuaded.

As an initial matter, we set forth the standard of review relevant to our resolution of this appeal. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more

of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed." (Internal quotation marks omitted.) *Rosado* v. *Commissioner of Correction*, 129 Conn. App. 368, 371–72, 20 A.3d 85, cert. denied, 302 Conn. 916, 27 A.3d 368 (2011).

I

The petitioner first contends that he was denied his right to a fair and impartial jury, as guaranteed by the sixth amendment to the United States constitution and by the constitution of Connecticut, article first, § 8. He further asserts that the habeas court improperly determined that this claim was procedurally defaulted. We disagree.

The record reveals the following additional facts and procedural history relevant to the resolution of this claim. On January 19, 1993, during the petitioner's criminal trial, the court clerk advised the court that a juror, H,[2] had indicated to the clerk that she "knew someone that was in the courtroom," a woman named "Joyce," who had provided day care to her child in 1991. The court informed H that "Joyce" was the victim's mother and asked whether H believed that any contact she had with the victim's mother and the victim would in any way affect her ability to be completely fair and impartial in all respects in the case. H responded: "I would have to be fair, yes, I would be fair." The court then asked: "You don't believe it would affect you in any way. Is that your answer?" H responded: "Not in my judgment, no." After H left the courtroom, the petitioner's trial counsel, Attorney Thomas Ullmann, indicated that he

---

[2] We use initials when referring to jurors to protect their legitimate privacy interests. See, e.g., *State* v. *Myers*, 126 Conn. App. 239, 256 n.9, 11 A.3d 1100, cert. denied, 300 Conn. 923, 14 A.3d 1006 (2011).

felt H could remain on the jury. The court agreed, stating that it found H to be a "very forthright individual." Ullmann then asked the court to inquire of H whether she mentioned this issue to any of the other jurors. The court asked H the requested question; she indicated that she "told one person in there that I did know somebody that was sitting in the room. That's all I said." The court subsequently informed the jury that H may have known someone involved in the case, but that the issue was resolved and should not be the subject of further discussion or concern.

The following day, while discussing another juror issue, Ullmann indicated to the court that he had seen H smile at the victim's mother, nod her head, and say hello, just as "anybody would who knew each other."

On January 20, 1993, the court indicated that two jurors were concerned that they had observed a court spectator in the ninth floor jury room. Ullmann explained to the court that one of the petitioner's relatives informed him that he had attempted to purchase food from the snack shop in the courthouse lobby, but the shop was closed. The individual asked where to purchase food, and someone in the lobby told him that there were vending machines on the ninth floor. The individual went upstairs to the machines and was fidgeting with the machines for some time. Ullmann indicated that there was no undue influence or improper activity during the course of the event, and he expressed his concern about the jurors' perceptions, because the petitioner's family had a right to be in the courtroom to express support, and their presence was not intimidation.

The court then questioned the two jurors, S and R, regarding the incident. S indicated that she saw someone leave the elevator and go to a snack machine on the ninth floor, but that it caused her no concern and

would not affect her. R stated that she saw a spectator on the ninth floor who went to the snack machines and then looked at the jurors. She stated that she "wouldn't want to see it happen again." The court indicated that it would not happen again and asked R whether anything about the incident would affect her ability to continue as a fair and impartial juror. R affirmed that it would not. The court informed the jury that a spectator had been told mistakenly that he could get food on the ninth floor, it would not happen again, and the jury should give it no further thought.

On January 27, 1993, the court noted that two jurors, R and M, had concerns that the court wanted to address on the record. When the court asked R to share her concerns, she replied that she would "tell [the court] in private." When advised that she could not, R told the court that she was sitting in her car that morning on Congress Avenue, and she looked up and saw a spectator who was in court every day. R further stated that she was aware of who was nearby when she walked in and out of the courthouse, and that she "found it strange." When the court asked R whether this would affect her ability to continue on the jury, she replied that it would not and was "just something that I felt you should know." The court asked R if she discussed the issue with any other jurors, and R said, "No." After R left the courtroom, Ullmann moved that she be excused because this was the second time she had expressed concerns, her statements regarding the vending machine incident contrasted with those made by S, and she preferred to address her concerns with the court in private. R was called back to the courtroom and questioned further, and she confirmed that she could continue as a juror.

M then entered the courtroom and indicated that on the previous Friday, his car needed an emergency brake job, and his mechanic told him that "it looked like the

brakes had been tampered with." When the court asked M if he "in any way connected [the incident] with this case," M responded that the timing seemed strange and that he hoped it was only a coincidence. M indicated that he did not even make a connection between the incident and the case until that morning, because of "something [another] juror had said." He said that he had told other jurors that his car needed a brake job over the weekend and that "the person who fixed the brakes was concerned that there was tampering." At Ullmann's request, the court then asked M which juror spoke to him and triggered him to raise the incident. M stated that R had told him separately from other jurors that she saw a spectator standing outside her car on Congress Avenue.

Ullmann indicated that M seemed sincere and agreed that the court could tell the jury that it made inquires and was satisfied that there was no problem with M remaining on the jury. Ullmann asked, however, that R be excused. The court expressed concern that M had contradicted R's statement that she had not discussed the Congress Avenue matter with anyone, which led the court to question R's candor. R was excused and an alternate juror was selected. The court explained to the jury that it had replaced one juror but that the jury should not concern itself with that, and that the trial would continue.

In his January 26, 2010 amended habeas corpus petition, the petitioner alleged that the court "failed to adequately inquire into the juror misconduct" regarding R, H, M and S, and "failed to ensure" that the petitioner was afforded a fair trial. The petitioner further alleged that "[t]he jurors were scared of [him] and his family," and that his conviction was "obtained in violation of [his] state and federal constitutional rights of due process of law and the right to a fair trial before an impartial jury." In his return, the respondent, the commissioner

of correction, raised the defense of procedural default pursuant to Practice Book § 23-30 (b).[3]

At the habeas trial, the court heard testimony from the petitioner and Ullmann regarding, inter alia, the issues involving R, H, M and S.[4] The petitioner testified, among other things, that he wanted H off of the jury and for Ullmann to move for a mistrial on the basis of H's recognition of the victim's mother, and that he wanted Ullmann to question the jurors individually to determine what they knew about the issues raised by R and M. Ullmann testified, inter alia, that he asked the trial court to canvass the jury individually regarding the issues raised by R, but not by M.[5] He further testified that, with respect to H, he made the determination that he felt she could stay on the jury, and that he "must have not thought [that her interaction with the victim's mother] was that important at the time." He also stated that if he had thought the jury was scared, he would have moved for a mistrial.

Also at the habeas trial, the petitioner and the respondent agreed to a stipulation, which was made an exhibit and entered into evidence. The stipulation read: "(1) One or more jurors observed a group of African-American people, who they recognized from the courtroom as sitting behind the [petitioner], who watched the jurors as they walked to their cars at the end of some days of evidence. (2) A juror told the sheriff about the above referenced incident."

---

[3] Practice Book § 23-30 (b) provides, in relevant part, that the respondent's return "shall allege any facts in support of any claim of procedural default, abuse of the writ, or any other claim that the petitioner is not entitled to relief."

[4] The habeas court also heard testimony from the petitioner's appellate counsel, attorney John Williams, regarding the purported juror misconduct issue. As the court noted, however, Williams "testified to having next to no recollection of any of the events in this matter and did not offer any substantive testimony . . . ."

[5] Ullmann testified that the trial court did not canvass the jury individually in response to this request.

In its memorandum of decision denying the petitioner's habeas corpus petition, the court found that this issue was procedurally defaulted because the facts underlying the claim "were well known to [Ullmann] at the time of the trial," and the habeas hearing "did not produce any new revelations that were not known earlier and could have been raised either with the trial court, on appeal or at the first habeas trial." The petitioner asserts on appeal that the court erred in finding his claim procedurally defaulted. We are not persuaded.

"We conduct a plenary review of the legal conclusions of the habeas court. Although the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous, whether those facts constituted a violation of the petitioner's rights . . . is a mixed determination of law and fact that requires the application of legal principles to the historical facts of [the] case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard. . . .

"Generally, [t]he appropriate standard for reviewability of habeas claims that were not properly raised at trial . . . or on direct appeal . . . because of a procedural default is the cause and prejudice standard. Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [This] standard is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . . [T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule. . . . [For example] a showing that the factual or legal basis for a claim was

not reasonably available to counsel . . . or . . . some interference by officials . . . would constitute cause under this standard. . . . Cause and prejudice must be established conjunctively. . . . If the petitioner fails to demonstrate either one, a trial court will not review the merits of his habeas claim." (Citations omitted; internal quotation marks omitted.) *Mish* v. *Commissioner of Correction*, 133 Conn. App. 845, 849–50, 37 A.3d 179, cert. denied, 305 Conn. 918, 47 A.3d 390 (2012).

On the basis of our review of the record, we cannot conclude that the habeas court erred in finding the petitioner's juror misconduct claims to be procedurally defaulted. With respect to the petitioner's claims regarding R, H, M and S, we agree with the habeas court that the facts of the incidents involving these jurors were well known to Ullmann, and the petitioner has shown no cause for Ullmann's failure to move for a mistrial and/or to raise the petitioner's purported juror misconduct claims before the trial court or on appeal. See, e.g., *Mercer* v. *Commissioner of Correction*, 49 Conn. App. 819, 826, 717 A.2d 763 (habeas court appropriately found claim defaulted because "several of the due process violations alleged by the petitioner were known to counsel at the time of trial and should have been addressed in accordance with the applicable rules of procedure"), cert. denied, 247 Conn. 920, 722 A.2d 810 (1998).

Although the petitioner contends that he received ineffective assistance of counsel, and that this constitutes the requisite cause for his procedural default, this argument is unavailing. As we discuss in part II of this opinion, we agree with the habeas court that the petitioner's trial and appellate counsel provided effective assistance. Accordingly, his ineffective assistance claims cannot provide the basis for cause and prejudice. See, e.g., *Saunders* v. *Commissioner of Correction*, 137 Conn. App. 493, 499–500, 48 A.3d 728, cert. denied, 307

Conn. 920, 54 A.3d 182 (2012); *Mish* v. *Commissioner of Correction*, supra, 133 Conn. App. 850–51.[6]

With respect to the petitioner's claim of juror bias predicated on the stipulation entered into evidence at the habeas trial, we note that the habeas court's finding that the facts set forth in that stipulation were known to Ullmann at the time of trial was clearly erroneous. In fact, both parties have indicated that the petitioner and Ullmann became aware of the stipulated facts after the criminal trial and direct appeal. We conclude, however, that the habeas court's ultimate finding of procedural default is correct because the petitioner has failed to demonstrate actual prejudice from the claimed impropriety set forth in the stipulated facts.[7] The stipulation indicates only that, if called to testify, one or

---

[6] Additionally, we are not persuaded by the petitioner's argument that the purportedly ineffective assistance of his first habeas counsel, Kelly, establishes the necessary cause and prejudice to overcome a claim of procedural default. The petitioner concedes that the purpose of Kelly's representation was to file a petition for a new trial based on allegedly new evidence of witness recantations. We agree with the habeas court that, although Kelly's failure to file that petition for a new trial on time likely constituted deficient performance, the petitioner suffered no prejudice because Kelly raised the same issues in a habeas corpus petition that was duly addressed by the court. To the extent the petitioner contends that Kelly rendered ineffective assistance by failing to research and/or include the juror bias allegations in the habeas corpus petition he filed on the petitioner's behalf, we agree that Kelly's failure to research all potential claims before filing a habeas corpus petition may constitute deficient performance. We note, however, that the petitioner's juror bias allegations also may have been subject to a procedural default defense at that time because they were not raised at trial or on direct appeal. See, e.g., *Mish* v. *Commissioner of Correction*, supra, 133 Conn. App. 849–51. Furthermore, even if the juror bias claims had not been deemed procedurally defaulted, they are substantively without merit, as discussed in further detail herein. Accordingly, the petitioner cannot demonstrate the requisite prejudice from Kelly's failure to raise the claims. See, e.g., *Vazquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 429, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011) (petitioner must show both deficient performance and reasonable probability that result of proceeding would have been different to establish ineffective assistance of counsel).

[7] "[W]e can affirm a correct decision even though the reasoning underlying that decision is flawed." *State* v. *Salmond*, 69 Conn. App. 81, 91, 797 A.2d 1113, cert. denied, 260 Conn. 929, 798 A.2d 973 (2002).

more jurors would state that they recognized a group of African-American spectators from the courtroom watching them as they walked to their cars after some of the days of the trial. The stipulation is silent as to the impact, if any, of these jurors' observations on their ability to render a fair and impartial verdict, and the petitioner has presented no other evidence establishing that the jurors' observations rendered them biased against him such that he was denied his right to a fair trial. Because the petitioner has failed to establish cause and prejudice, the habeas court did not err in finding this claim to be procedurally defaulted.

## II

We turn next to the petitioner's ineffective assistance of counsel claims against his trial counsel, Ullmann, and his appellate counsel, John Williams. The petitioner asserts that the habeas court erroneously rejected these claims. We disagree.

"We examine the petitioner's underlying claim[s] of ineffective assistance of counsel in order to determine whether the habeas court abused its discretion in denying the petition for certification to appeal. Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That

requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . ." (Citation omitted; internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 429–30, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011).

To satisfy the performance prong of the *Strickland* test, the petitioner must "demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Boyd* v. *Commissioner of Correction*, 130 Conn. App. 291, 294–95, 21 A.3d 969, cert. denied, 302 Conn. 926, 28 A.3d 337 (2011). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Orellana* v. *Commissioner of Correction*, 135 Conn. App. 90, 98, 41 A.3d 1088, cert. denied, 305 Conn. 913, 45 A.3d 97 (2012).

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, supra, 128 Conn. App. 430.

"In regard to the [prejudice] prong, our Supreme Court [has] distinguished the standards of review for claims of ineffective trial counsel and ineffective appellate counsel. . . . For claims of ineffective appellate counsel, the [prejudice] prong considers whether there is a reasonable probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial. . . . This requires the reviewing court to [analyze] the merits of the underlying claimed error in accordance with the appropriate appellate standard for measuring harm." (Citations omitted; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, 119 Conn. App. 530, 535, 988 A.2d 881, cert. denied, 296 Conn. 902, 991 A.2d 1103 (2010).

## A

The petitioner claims first that Ullmann provided ineffective assistance because he failed to impeach Preston's allegedly perjured, inconsistent eyewitness testimony. Specifically, he contends that Preston testified at the petitioner's first criminal trial that he was approximately 250 feet away from the victim and could "not exactly" see the face of the individual who shot the victim, whereas he testified at the second trial that he was approximately fifteen to twenty feet away. According to the petitioner, Ullmann demonstrated a "lack of reasonable diligence" in failing to impeach

Preston with his prior testimony, and this failure purportedly prejudiced the petitioner because it is "highly unlikely that the jury would have convicted [the petitioner] without the perjured and coerced testimony of . . . Preston."

At the habeas trial Ullmann testified, among other things, that he anticipated before the criminal trial that there might be difficulty with Preston's testimony because Preston did not identify the petitioner to the police until his third conversation with them. He further indicated that for each witness at trial, he prepared a folder containing "every police report, every statement and any transcript involving their testimony," and he reviewed that file prior to cross-examining the witness. In rejecting the petitioner's ineffective assistance of counsel claim against Ullmann, the habeas court specifically credited Ullmann's testimony as credible and found that "the representation that [the petitioner] received was more than constitutionally sufficient." The court further stated that Ullmann's performance was "well within the bounds of [c]onstitutional acceptability," and that the petitioner presented no evidence that would lead the court to conclude that "there was any likelihood that the outcome of the trial would have been any different." We agree with the habeas court.

The petitioner bases his ineffective assistance of counsel claim on his assertion that Ullmann failed to impeach Preston's inconsistent testimony, but the record reveals that Preston's testimony in the two trials was not at odds. Indeed, although the petitioner contends that Preston testified during the first trial that he was 250 feet away from the victim and testified at the second that he was "approximately 15–20 feet away," this argument ignores the remainder of Preston's testimony at the second trial. Preston did testify that he was "between fifteen and twenty feet" from the group of people who were arguing with the victim, including

the petitioner, whom he recognized. He then, however, testified that the arguing group continued moving up the street, but he followed the group only "a little bit less than half way up the block."

Additionally, during his testimony Preston marked the location of the shooting and his location at the time of the shooting on a map. In his closing argument, Ullmann summarized Preston's testimony and the map by stating that Preston was the only eyewitness to the shooting, but "from where he says he was standing . . . there's some two hundred and fifty, maybe two hundred and sixty feet, almost a football field length between where he observes what happens and . . . where he's standing."[8] Accordingly, there was no inconsistency between Preston's testimony at the petitioner's first and second criminal trials, and it cannot be said that Ullmann rendered ineffective assistance by failing to impeach him on this point.

B

The petitioner also contends that Ullmann provided ineffective assistance because he failed to respond adequately to "numerous juror issues that occurred during the trial." Specifically, he asserts that Ullmann (1) did not move for a mistrial when H smiled and nodded hello to the victim's mother and (2) did not sufficiently

---

[8] Moreover, the petitioner provided no evidence in support of his assertion that Preston's testimony at the second trial was coerced or perjured. Although he appears to cite Preston's testimony at the first habeas trial as support for this claim, Preston did not testify at the trial on the present habeas corpus petition, and the first habeas court found that "Preston's habeas testimony was extraordinarily loose, equivocal and contradictory," and ultimately not credible. *Streater* v. *Commissioner of Correction*, Superior Court, judicial district of New Haven, Docket No. CV-96-0389147-S (December 17, 1998). We will not revisit that credibility determination here. See, e.g., *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 587, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005).

request that the court conduct further inquiry into "other juror issues."[9]

Ullmann testified at the habeas trial that, with respect to H, he "must have not thought [that her interaction with the victim's mother] was that important at the time." On cross-examination, he further indicated that he made a tactical decision that he wanted H on the jury, and was "quite certain" that "if [he] decided to keep her on [the jury], [he] felt that she was favorable." He also stated that if he had thought the jury was scared, he would have moved for a mistrial. Ullmann further testified that although he requested that the court individually question the jurors the day that R was dismissed, "the judge went into something else and then it just didn't happen . . . ." He also stated that he felt the court gave appropriate limiting instructions to the jury after its investigation into the brake incident and the vending machine incident. As noted previously, the habeas court specifically credited Ullmann's testimony as credible and rejected the petitioner's ineffective assistance of counsel claims on both performance and prejudice grounds.

We agree with the habeas court that Ullmann provided effective assistance of counsel. Regarding H, Ullmann testified credibly that he did not feel that H's acknowledgement of the victim's mother was important at the time of the trial, and he determined ultimately that she should stay on the jury because he believed that she would be a favorable juror for the petitioner. The petitioner has provided nothing to overcome the presumption that Ullmann's tactical decision regarding the composition of the jury was anything other than sound trial strategy. See *Orellana* v. *Commissioner of*

[9] The alleged "juror issues" underlying the petitioner's ineffective assistance of counsel claims are the same as the purported juror bias claims discussed in part I of this opinion, and the relevant facts and procedural history are as set forth in part I of this opinion.

*Correction,* supra, 135 Conn. App. 98. Furthermore, the petitioner has not established any prejudice from Ullmann's purported failure to request a mistrial, i.e., that the court would have granted a mistrial on the basis of H's relationship with the victim's mother even if Ullmann had requested one. Indeed, the court found H to be a "very forthright individual" regarding her knowledge of the victim's mother, and had concluded that there was no problem with H's continuing to sit on the jury.

Similarly, there is no merit to the petitioner's claim that Ullmann failed to ensure that the court conducted sufficient inquiries of the jury with respect to the other juror issues raised at trial.[10] The record reflects that the court conducted an inquiry into the incidents involving R, H, M and S, and that Ullmann engaged with the court during the inquiry process, requesting that the court ask certain additional questions of the jurors and making an ultimately successful motion that R be excused from the jury. The petitioner has not demonstrated that Ullmann's performance in this regard was constitutionally deficient. Although the petitioner contends specifically that Ullmann rendered ineffective assistance by failing to "get a ruling from the court on his request" that the court individually canvass the jurors with respect to the concerns raised by R, the petitioner again has provided no support for his claim that this constituted

---

[10] To the extent the petitioner relies on *State* v. *Mukhtaar,* 253 Conn. 280, 750 A.2d 1059 (2000), for the proposition that the trial court was *required* to conduct a preliminary inquiry of the jurors here, and that its failure to do so deprived the petitioner of a fair trial, we note that the language cited from *Mukhtaar* derives from our Supreme Court's holding in *State* v. *Brown,* 235 Conn. 502, 525–26, 668 A.2d 1288 (1995). *Brown,* in which the court exercised its inherent supervisory powers over the administration of justice to hold that a trial court must—even in the absence of a request from counsel—conduct a preliminary inquiry once it is presented with any allegations of jury misconduct in a criminal case, was not decided until 1995, and the petitioner's criminal trial concluded in 1993.

deficient performance, nor has he presented evidence that the result of the proceedings would have been different had Ullmann pressed the court on this request. Accordingly, we cannot say that Ullmann provided ineffective assistance for failing to pursue this issue further with the court. See *Moody* v. *Commissioner of Correction*, 108 Conn. App. 96, 105, 946 A.2d 1268, cert. denied, 288 Conn. 906, 953 A.2d 649 (2008) (counsel not ineffective for refraining to press issue of juror canvassing where court had determined that canvass was adequate).

## C

Next, the petitioner claims that Williams provided ineffective assistance because he did not raise prosecutorial impropriety and juror bias claims in the petitioner's direct appeal of his conviction. We are not persuaded.

The following additional facts are relevant to this claim. During the redirect examination of Cheek at the petitioner's criminal trial, the prosecutor, Michael Pepper, asked Cheek if she was afraid to testify in the case because she lived very close to the petitioner. Cheek answered in the negative and said she had known the petitioner "[f]or about a pleasant twenty-five, twenty-six years." She also indicated that she knew the petitioner's family. When Pepper asked if she saw any of the petitioner's family members in the courtroom, she said that she did not. Pepper further asked if Cheek had been speaking to any of the spectators in the courtroom during breaks in her testimony, and she stated that she had, but she did not know if they were related to the petitioner. Pepper then asked if Cheek knew Lloyd Streater, and whether he was sitting in the courtroom. Cheek said that she could "see him now"; when Pepper asked Cheek to point him out, Cheek asked: "Can you

stand up?" Ullmann objected, and the court sustained the objection.[11]

Also at the criminal trial, on direct examination of Dwayne Watkins, a friend of the victim, Pepper asked whether Watkins knew an individual named Keith Sprule. Watkins indicated that he did, and that Sprule also was friends with the victim. Pepper then asked: "Okay. Do you know what happened to Keith Sprule?" Ullmann objected and asked that the jury be excused. After the jury exited the courtroom, Ullmann stated: "Your Honor . . . a follow-up answer to that question is that Mr. Sprule is, now, dead. And the implication is that it's associated or the impression is left that, here's another guy, who was a friend of [the victim] . . . and Mr. Watkins, here, who's dead. . . . And to leave that impression with these jurors is outrageous. And I'm moving for a mistrial . . . ." The court sustained the objection but denied Ullmann's motion for a mistrial. When the jury returned, the court reiterated that it had sustained the objection to the last question and that the jury should disregard the question and any answer that may have been given.[12]

The petitioner contends that Pepper's statements and conduct amounted to prosecutorial impropriety that called into question the fairness of the petitioner's trial, and he asserts that Williams' failure to raise the issue constituted ineffective assistance. The petitioner further argues that Williams rendered ineffective assistance because he failed to raise the juror bias claims

---

[11] In his appellate brief, the petitioner contends that Pepper asked Lloyd Streater to stand. The record does not support this assertion. The petitioner appears to have amended this argument in his reply brief, contending that Cheek would not have asked Lloyd Streater to stand unless Pepper had asked her to identify him, and that "[o]ther than intimidation tactics, there was absolutely no need to ask [Cheek] to point out [the petitioner's] brother Lloyd [Streater]."

[12] Watkins had answered "Yeah" to Pepper's question before Ullmann objected, but provided no additional detail.

discussed in parts I and II B of this opinion. The habeas court found that the petitioner's counsel provided constitutionally adequate performance, and that the petitioner suffered no prejudice. We agree with the habeas court.

This court has stated repeatedly that "[t]he right to counsel is not the right to perfect representation. . . . [Although] an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue. . . . [I]f the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation." (Internal quotation marks omitted.) *Gray* v. *Commissioner of Correction,* 138 Conn. App. 171, 178, 50 A.3d 406, cert. denied, 307 Conn. 929, 55 A.3d 570 (2012).

On the basis of our review of the record, we conclude that it was within Williams' strategic discretion not to include the prosecutorial impropriety or juror bias issues in the petitioner's direct appeal, and that his failure to do so did not constitute deficient performance. The petitioner's prosecutorial impropriety claim is based on two incidents: (1) Pepper asking, or causing Cheek to ask, Lloyd Streater to stand up during the trial, and (2) Pepper asking Watkins about Sprule's whereabouts. Although the petitioner contends that Pepper's conduct was "designed to divert the jury's attention, heighten their emotions and change the focus of the trial . . . to an inference that the Streater family [members] were bad dangerous people," we agree with the respondent that Pepper's questions were directed to the witnesses' credibility and any potential bias or reluctance in their testimony, and were not improper. In any event, even assuming arguendo that Pepper's questioning was improper, it does not rise to the level

of prosecutorial impropriety that impacted the fairness of the petitioner's trial.[13] Moreover, as discussed in part II B of this opinion, the petitioner's purported juror bias claim is also without merit. Williams cannot be faulted for failing to pursue these unmeritorious claims on appeal. See *Gray* v. *Commissioner of Correction,* supra, 138 Conn. App. 178; see also *Moore* v. *Commissioner of Correction,* supra, 119 Conn. App. 543–44 (within appellate counsel's discretion to determine whether to raise instances of prosecutorial impropriety on appeal).[14]

[13] Our determination of whether claimed prosecutorial impropriety impacted the petitioner's right to a fair trial is based on the factors set forth in *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Miller,* 128 Conn App. 528, 535–36, 16 A.3d 1272, cert. denied, 301 Conn. 924, 22 A.3d 1279 (2011). Here, Ullmann did not invite Pepper's questioning, and the questions focused on potential influences on witnesses, which Ullmann testified at the habeas trial was "part of the state's theory . . . part of their case." Nevertheless, the claimed improper questioning only occurred twice. In both instances, Ullmann objected to the purportedly improper questioning, and the trial court sustained the objections both times. With respect to the questioning of Watkins, Ullmann not only objected immediately to the question regarding Sprule's whereabouts, but also the court issued curative instructions to the jury that it should disregard the question and any answer given. See, e.g., *State* v. *Martinez,* 95 Conn. App. 162, 182, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006) (improper question did not deprive defendant of fair trial where immediate objection made and curative instructions given). Furthermore, the state's case against the petitioner was strong, particularly given the eyewitness testimony from Preston and the testimony of another witness who saw the petitioner and three other men in a maroon car in the area of the crime minutes prior to the shooting. See *State* v. *Streater,* supra, 36 Conn. App. 347–50.

[14] Because we have determined that the petitioner has not met his burden on the "performance prong," we need not analyze whether he was prejudiced by Williams' alleged deficiencies. See, e.g., *Vazquez* v. *Commissioner of Correction,* supra, 128 Conn. App. 430. Even assuming that Williams' performance was constitutionally deficient, however, we agree with the habeas court that the petitioner suffered no prejudice as a result of the allegedly

Accordingly, because the petitioner has not established that the issues he has raised are debatable among jurists of reason, that a court could have resolved them in a different manner, or that the questions presented are adequate to deserve encouragement to proceed further; see, e.g., *Rosado* v. *Commissioner of Correction*, supra, 129 Conn. App. 371; we conclude that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

defective performance. The petitioner has provided no evidence that the outcome of his appeal would have been different had Williams raised the prosecutorial impropriety or juror bias claims; rather, he asserts simply that "[p]rejudice is self-evident" because the "outcome of the appeal would have been different and the [petitioner's] conviction reversed." Conjecture, without more, is insufficient to meet the petitioner's burden on the prejudice prong. See, e.g., *Heredia* v. *Commissioner of Correction*, 106 Conn. App. 827, 833, 943 A.2d 1130 ("[i]n a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation but by demonstrable realities"), cert. denied, 287 Conn. 918, 951 A.2d 568 (2008).