LANCE WARGO *v.* COMMISSIONER
OF CORRECTION
(AC 33222)

Robinson, Sheldon and Keller, Js.

Argued May 20—officially released August 6, 2013

*Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Erika L. Brookman*, assistant state's attorney, for the appellee (respondent).

SHELDON, J. The petitioner, Lance Wargo, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus challenging his confinement by the respondent commissioner of correction pursuant to judgments of conviction for murder, arson in the first degree, risk of injury and tampering with evidence on the ground of ineffective assistance of counsel. On appeal, the petitioner contends that the habeas court improperly rejected his claims that his trial counsel was ineffective because (1) trial counsel had a conflict of interest in representing him both on his claim for insurance proceeds in connection with the fire that gave rise to certain of his criminal charges and at his underlying trial on those charges, and (2) his trial attorney did not effectively cross-examine the state's expert as to the cause and origin of the subject fire. We affirm the judgment of the habeas court.

The following facts, as recited by our Supreme Court, in upholding this court's affirmance of the petitioner's conviction on direct appeal, are relevant to our resolution of the petitioner's claims on appeal. "On November 19, 1994, at approximately 3:19 a.m., Ronald McClain and Sheila McClain, neighbors who lived across the street from the [petitioner] [on Hillside Avenue in Plymouth], awoke to screams from the [petitioner's] children. Ronald McClain observed an orange glow coming from the left side of the [petitioner's] house. He also observed the [petitioner's] two children on the roof of the front porch, a ladder against the front porch and the [petitioner] standing at the bottom of the ladder. [Ronald] McClain called 911 and went downstairs to let the [petitioner and his children] into [McClain's] home. The children were screaming that their house was on fire and that they could not find their mother [Wendy Wargo]. The [petitioner] stated that his wife was in the house, that he could not get her out and that

he did not know if she had come home. The children remained at the McClain home while the [petitioner] and Ronald McClain returned to the burning house. The [petitioner] again stated that he did not know if his wife had come home that evening.

"The firefighters arrived a few minutes later and found the [petitioner] outside the house, confused and attempting to put water on the fire with a garden hose. The [petitioner] told the firefighters that he did not know his wife's whereabouts. Later, the [petitioner], while he pointed to the den, told fireman Frederick Telke, 'Yes, she's in here, she's in here.' When asked if he was sure, the [petitioner] walked to the driveway and pointed to his wife's car.

"Firefighters entered the home and approached the den, where the fire was concentrated, but were unable to remain due to the high temperatures, heavy smoke and unstable floor. The body of the victim . . . was later found in this area. Firefighters also entered the second floor of the house and found only smoke damage. They did not hear any smoke detector alarms.

"Several hours later, Officer Gerald Allain of the Plymouth police department questioned the [petitioner]. The [petitioner] stated that the victim smoked cigarettes and that he recalled the smoke alarms going off. He stated that the thick smoke forced him to his knees [and that] he took the children to the porch roof.

"On November 19, 1994, the [petitioner] gave a signed, written statement to the police. He indicated that the victim slept on the couch because their marriage was 'on the rocks.' That same day, the [petitioner] told the victim's uncle, James Castiola, that he knew what had happened. He stated that the victim had come home, and had lain down on the couch, [near] approximately fifty videotapes. While on the couch, the victim had lit a cigarette and had fallen asleep. The [petitioner]

told Castiola that the fire had been accelerated by the videotapes, which cannot be put out when they catch fire.

"State Trooper Kevin McGurk was assigned to determine the cause and origin of the fire. He examined the Wargo home the following morning and determined that the fire originated in the den. McGurk discovered a pour pattern leading up to the area of origin, which indicated that an accelerant had been used. On the basis of his observations, McGurk concluded that the fire had been intentionally set. Other officers executed a search warrant on the Wargo home and retrieved an empty bottle of bleach from the basement and a can of acetone from the storage shed. Joseph Cristino, a forensic analysis engineer, examined the two smoke detectors retrieved from the Wargo home. [Cristino found that it was 'highly improbable' that the first floor smoke detector was working at the time of the fire and that, had the battery been connected to the second floor detector, there was a high probability that it would have worked at the time of the fire.]

"A notebook also was seized from the [petitioner's] bedroom dresser. The parties stipulated that the notes contained therein were written in the [petitioner's] handwriting. The [petitioner] was a member of the fire brigade at work and had received training in chemical fires and hazardous materials. The [petitioner] was familiar with spontaneous combustion caused by the combination of alkalies and acids. The [petitioner] admitted writing various phrases in the notebook, such as 'lock box in shed,' 'tool box,' 'acetone,' 'alcohol clorox,' 'alm foil,' 'dry run,' 'rope kds drs,' 'straps,' 'pillow,' 'oil in can,' 'rid of stuff,' 'glvs,' 'hat,' 'shirt,' 'cigs,' and 'ldr.' The [petitioner] stated that these abbreviations could have been a camping list, but that he did not know why he wrote these abbreviations." *State* v. *Wargo*, 255 Conn. 113, 117–19, 763 A.2d 1 (2000).

The petitioner was convicted of one count of murder in violation of General Statutes § 53a-54a (a), two counts of arson in the first degree in violation of General Statutes § 53a-111 (1) and (4), one count of tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1), and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1993) § 53-21. As noted, the petitioner's conviction was affirmed by this court and our Supreme Court.

On July 25, 2005, the petitioner filed this action seeking a writ of habeas corpus on the following bases: (1) that he is actually innocent of the crimes for which he was convicted; (2) that the testimony regarding the cause of the victim's death was false and unreliable; (3) that his trial attorney provided ineffective assistance because he had a conflict of interest in representing him in a civil contingent fee matter against his homeowner's insurance carrier and in the criminal matter giving rise to the present habeas petition; and (4) that his trial attorney was ineffective in his cross-examination of the witnesses who testified as to the cause of the victim's death and the fire science evidence.

By memorandum of decision dated January 20, 2011, the habeas court rejected all of the petitioner's claims and denied his petition. The habeas court thereafter granted the petitioner's petition for certification to appeal to this court and this appeal followed. Additional facts will be set forth as necessary.

On appeal, the petitioner challenges only the habeas court's rulings on his ineffective assistance of counsel claims.[1] "Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is

---

[1] The petitioner does not challenge the habeas court's rejection of his claim that his criminal trial counsel, M. Hatcher Norris, was ineffective in his cross-examination of the medical examiner regarding the victim's cause of death.

well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong of the *Strickland* test, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

. . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) *Streater* v. *Commissioner of Correction,* 143 Conn. App. 88, 102–104, 68 A.3d 155 (2013).

I

The petitioner first claims that the habeas court erred in rejecting his claim that his trial attorney had a conflict of interest due to the fact that he represented the petitioner in a civil contingent fee matter against his homeowner's insurance carrier and in the criminal matter giving rise to this habeas petition. Specifically, he contends that his attorney failed to advise him not to cooperate with the insurance investigation in light of the risk that such cooperation posed to the petitioner's criminal defense, and that his attorney should have moved to suppress certain evidence that was obtained by the insurance company and later forwarded to the state. He further claims that the alleged conflict of interest affected his attorney's performance in plea negotiations, for it made his attorney less likely to seek a favorable plea offer from the state or to persuade the petitioner to plead guilty because, by so doing, he would have diminished the likelihood that the firm would recover a contingent fee on the claim for insurance proceeds. We disagree.

The habeas court made the following factual findings related to this claim. "On or about November 21, 1994, two days after the fire, the petitioner, on his own, filed a claim under his homeowner's insurance for fire damage.

The next day the petitioner retained Attorney Martin Gold for representation in both the criminal investigation of the fire and the petitioner's insurance claim. Within several weeks, [M. Hatcher] Norris, of the same firm of Butler, Norris & Gold, became lead counsel on both matters. During this time, the petitioner entered into a contingency agreement with the law firm that provided for the firm to receive a certain percentage of the proceeds of any insurance recovery. Norris had significant experience in trying arson and murder cases. Earlier that year, he was lead counsel in the landmark trial of *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), an arson case in which our Supreme Court later held that a trial court should consider the validity of the methodologies underlying proffered scientific evidence in determining the admissibility of that evidence. Norris was board certified nationally both as a criminal and a civil trial advocate.

"Norris thoroughly and repeatedly advised the petitioner of the risks of going forward with the insurance claim. In particular, Norris informed the petitioner that, to maintain his claim, he would have to give a statement to the insurance company under oath and allow the company to inspect his property, and that anything the petitioner said or provided could be shared with the state and admitted in any future criminal trial. Although Norris did not specifically instruct or advise the petitioner not to pursue the insurance claim, Norris did inform him that it was not in his best interests to do so, and that ordinarily he would not permit any client under investigation for a crime to speak to anyone other than his lawyer.

"The petitioner was adamant, however. He strongly maintained his innocence and insisted on pursuing his

insurance claim. Norris did not see any conflict of interest because in both matters the petitioner sought to establish his innocence. Accordingly, at his client's request, Norris notified the insurance company that it could inspect the petitioner's house and conduct an examination of the petitioner under oath. The insurance company accomplished these matters between late November, 1994, and February, 1995.

"During its inspection, the insurance company discovered the notebook that contained the petitioner's writings. The company asked the petitioner about it during the examination under oath. In late 1994 and early 1995, the company turned over all items it obtained from its inspection, as well as transcripts of the examination under oath, to the state fire marshal's office, at the latter's request pursuant to General Statutes § 38a-318. . . .

"The petitioner was arrested on March 7, 1995. The petitioner entered into a new retainer agreement with Norris for the criminal case. Meanwhile, the insurance company had not paid the claim as of November, 1995, which was shortly before the one year limitations period would run. Although Norris advised the petitioner against filing suit, the petitioner insisted that he do so. Norris thereupon obtained another contingency fee agreement with the petitioner and filed a timely suit against the insurance company." (Footnotes omitted.)

On the basis of these facts, the habeas court rejected the petitioner's ineffective assistance of counsel claims. The habeas court found that Norris had, in fact, advised the petitioner as to the risks associated with cooperating with the insurance company, but that the petitioner had insisted on pursuing his claim for the insurance proceeds. The habeas court concluded that, even if a conflict of interest did exist, there was no legal basis for the suppression of the notebook that was found by

the insurance company.[2] The habeas court also found that the petitioner failed to prove that a conflict of interest prevented Norris from effectively engaging in plea negotiations with the state. The habeas court credited Norris' testimony that he had conveyed the state's offer of forty-five years incarceration to the petitioner and had explained to the petitioner the strengths and weaknesses of the state's case. The habeas court found: "Given the petitioner's resolute opposition to a plea, however, there was nothing else that Norris could reasonably have done to induce a plea."

On the basis of our review of the record, we conclude that the habeas court's factual findings and legal conclusions are supported by the record and, thus, that it did not err in concluding that the petitioner was not deprived him of his constitutional right to effective assistance of counsel due to the existence of an alleged conflict of interest.

II

The petitioner also claims that Norris was ineffective in not properly cross-examining the state's expert as to the cause and origin of the fire. The respondent contends, and the record confirms, that the petitioner has abandoned his claim that Norris ineffectively cross-examined the state's fire expert. Indeed, the petitioner concedes that Norris' cross-examination was in conformance with the law as it existed at the time of the petitioner's criminal trial. The petitioner argues, however, that the holding of *State* v. *Porter*, supra, 241 Conn. 57, which was decided a few months after the conclusion of his criminal trial, established new guidelines governing the admissibility of scientific evidence

---

[2] The petitioner asks this court to adopt a rule providing for the suppression of evidence obtained as a result of an ethical violation by counsel. Because we do not conclude that such a violation existed in this case, we decline the petitioner's invitation.

that should apply retroactively to his case. Because a claim that new law should apply retroactively to a criminal trial cannot possibly have any bearing on the effectiveness of counsel's performance during that earlier trial, such a claim cannot be vindicated via a habeas petition claiming ineffective assistance of counsel.[3]

The judgment is affirmed.

In this opinion the other judges concurred.

[3] We also note that the petitioner did not raise this *Porter* issue in his petition and, thus, the habeas court did not address this issue. It is axiomatic that a claim raised for the first time on appeal is not properly before this court.