******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# NABEEL KADDAH *v.* COMMISSIONER OF CORRECTION
## (AC 42942)

Alvord, Elgo and Alexander, Js.

*Syllabus*

The petitioner, who had been convicted of the crimes of murder, attempt to commit murder and unlawful restraint in the first degree, appealed to this court from the judgment of the habeas court, which denied his third amended petition for a writ of habeas corpus. The petitioner claimed that his counsel in the two prior habeas actions rendered ineffective assistance by not pursuing a claim that his counsel at trial and on direct appeal were ineffective for having failed to challenge the trial court's jury instructions as to his affirmative defense of mental disease or defect and the element of intent required to find him guilty of the charges against him. The habeas court concluded that, although the trial court twice included the definition of general intent in its jury instructions, the jury was not misled into believing that it could find the petitioner guilty without also finding that he had the specific intent to kill. The habeas court also concluded that the petitioner failed to establish that he was prejudiced by prior habeas counsel's failures to pursue a claim that trial and appellate counsel rendered ineffective assistance in choosing not to challenge the trial court's failure to instruct the jury that it could find the petitioner not guilty if it determined that, due to mental disease or defect, he lacked substantial capacity to appreciate the wrongfulness of his conduct. The habeas court determined that the evidence the petitioner had offered as to the defense of mental disease or defect was insufficient to overcome the overwhelming evidence of his guilt. *Held*:

1. The petitioner could not prevail on his claim that he was prejudiced by prior habeas counsel's failures to argue that trial and appellate counsel rendered ineffective assistance in deciding not to challenge the jury instructions on the element of intent in the crimes of which he was convicted; the petitioner's claim had no reasonable probability of success on appeal, as any possible risk that the jury was misled as to that element was eliminated by the court's numerous other proper instructions as to that element.

2. The habeas court properly concluded that the petitioner failed to establish that he was prejudiced by prior habeas counsel's failures to challenge the choice by his trial and appellate counsel not to dispute the jury instruction as to the defense of mental disease or defect: the habeas court reasonably determined that the jury likely did not credit the testimony of the petitioner's expert witness, M, a psychiatrist and neurologist, that the petitioner's medical conditions made it impossible for him to plan, deliberate and act rationally, as M's testimony was contradicted by the state's witness, B, a psychiatrist, and the court's finding that the state thoroughly discredited M's testimony on cross-examination was not clearly erroneous; moreover, although the habeas court did not have the opportunity to evaluate the demeanor of M or B during their testimony at the petitioner's criminal trial, it was the habeas court's exclusive province to weigh all the evidence before it, which included the transcripts of that trial, and, given the substantial evidence in support of the petitioner's guilt, there was no reasonable probability that, but for the absence of an instruction as to whether he lacked substantial capacity to appreciate the wrongfulness of his conduct, the result of his criminal trial would have been different.

Argued February 17, 2021—officially released April 26, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment dismiss-

ing the petition, from which the petitioner, on the granting of certification, appealed; thereafter, the Supreme Court reversed the habeas court's judgment in part and remanded the case to that court for further proceedings; subsequently, the court, *Newson, J.*, rendered judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Craig P. Nowak*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

ELGO, J. The petitioner, Nabeel Kaddah,[1] appeals from the judgment of the habeas court denying his third petition for a writ of habeas corpus, which alleged that his first and second habeas counsel rendered ineffective assistance. On appeal, the petitioner claims that the court erred in rejecting his claim that his prior habeas attorneys were ineffective in not pursuing the claim that his trial and appellate counsel were ineffective for their failure to challenge the trial court's jury instructions as to (1) the element of intent required for the specific offenses alleged against him and (2) his affirmative defense of mental disease or defect. We disagree and, accordingly, affirm the judgment of the habeas court.

The following facts, as set forth by our Supreme Court in the petitioner's direct appeal, and procedural history are relevant to our resolution of the petitioner's claims. "Between 3 and 3:30 a.m. on August 27, 1994, the [petitioner], while driving his gray Pontiac Grand Prix, approached Leanne Kollar on Middle Street in Bridgeport. Kollar, who was working as a prostitute, entered the [petitioner's] car in anticipation of engaging in sex for money. The [petitioner] drove around Bridgeport, eventually stopping on Salem Street. He turned off the engine and locked the doors to the vehicle. The [petitioner] then began to choke Kollar, telling her that, if she removed her clothes, he would not hurt her. Kollar began to undress, and the [petitioner] reclined her seat back and started to choke her again. Kollar managed to open the car door in an attempt to escape, and the [petitioner] began hitting and punching her. They both rolled out of the car together, after which the [petitioner] kneeled over Kollar and continued strangling her. After hitting the [petitioner] and knocking [the petitioner's] eyeglasses off his face, Kollar was able to flee to a nearby house. The [petitioner] then drove away.

"When the police arrived, Kollar gave them a description of the [petitioner] and told the officers where the [petitioner] lived, as she had been to his apartment on prior occasions. The police went to the [petitioner's] apartment and waited for him to return. Meanwhile, the [petitioner] returned to Middle Street and picked up Jennifer Williamson, another prostitute. The [petitioner] drove to the corner of Maplewood and Laurel Avenues, where he and Williamson engaged in a physical struggle. The [petitioner] hit Williamson, bit her on the back and strangled her. During the struggle, Williamson stopped moving and the [petitioner] pushed her out of the car and drove away.

"Sara Iza, a resident of Laurel Avenue, saw the [petitioner's] car on Maplewood Avenue at approximately 5:30 a.m. on August 27, 1994. When her husband, Luis Iza, went outside to start his car at approximately 6

a.m., he saw Williamson's naked body lying in the street, in the same spot where Sara Iza had seen the [petitioner's] car stop earlier. Malka Shah of the [O]ffice of the [C]hief [M]edical [E]xaminer testified that Williamson died from asphyxia, which had been caused by strangulation.

"At his trial, the [petitioner] raised the defenses of mental disease or defect and, alternatively, extreme emotional disturbance. The jury rejected these defenses and found the [petitioner] guilty of the murder of Williamson and the attempted murder and unlawful restraint of Kollar."[2] (Footnotes omitted.) *State* v. *Kaddah (Kaddah I)*, 250 Conn. 563, 565–66, 736 A.2d 902 (1999). Our Supreme Court subsequently affirmed the petitioner's conviction on direct appeal. See id., 581.

"In 2001, the petitioner, represented by [A]ttorney Salvatore Adamo, filed his first petition for a writ of habeas corpus, alleging that his appellate counsel, [A]ttorney Glenn Falk, had rendered ineffective assistance in the direct appeal of the underlying criminal case because he had failed to argue the existence of a conflict between the petitioner and his trial attorney, James Ruane, and had failed to raise a Connecticut constitutional claim. The petitioner further alleged that Ruane had rendered ineffective assistance in the underlying criminal case. The petitioner alleged, among other things, that Ruane had asserted the defense of mental disease or defect against the petitioner's wishes, did not permit the petitioner to testify on his behalf and failed to argue effectively against the sparse medical evidence used to convict the petitioner. The court, *White*, *J.*, denied the habeas petition. The petitioner appealed from the judgment of the habeas court but withdrew the appeal before this court rendered judgment." *Kaddah* v. *Commissioner of Correction*, 105 Conn. App. 430, 433–34, 939 A.2d 1185, cert. denied, 286 Conn. 903, 943 A.2d 1101 (2008).

In 2004, the petitioner, represented by Attorney Joseph Visone, filed a second habeas petition alleging ineffective assistance of counsel by Adamo in the first habeas proceeding.[3] Id., 434. The habeas court, *Fuger*, *J.*, denied that petition, along with the petitioner's petition for certification to appeal. Id. This court subsequently dismissed the petitioner's appeal from the denial of the second habeas petition, concluding that Judge Fuger had not abused his discretion in denying the petition for certification to appeal. See id., 446.

The petitioner filed the third and present habeas petition on September 28, 2012, alleging, inter alia,[4] that Visone rendered ineffective assistance while representing the petitioner in the second habeas petition by failing to raise certain claims regarding the jury instructions at his criminal trial. See *Kaddah* v. *Commissioner of Correction (Kaddah III)*, 324 Conn. 548, 553, 153 A.3d 1233 (2017). More specifically, the petitioner

argued that the trial court improperly instructed the jury as to (1) the element of intent required to prove the specific crimes charged by the state and (2) his affirmative defense of mental disease or defect. The habeas court initially dismissed the petition on September 29, 2014, concluding that it was "not cognizable as a matter of law." Id., 551. Our Supreme Court subsequently reversed in part the judgment of the habeas court and remanded the case to that court for further proceedings. See id., 571.

On remand, the habeas court conducted a trial on the present petition on October 2, 2018. The parties waived their right to present additional evidence and stipulated to the claims being resolved based on the record of the prior habeas trial, of which the court took judicial notice. On March 13, 2019, the court issued a memorandum of decision in which it denied the petitioner's habeas petition. The court granted the petitioner's request for certification to appeal, and this appeal followed. Additional facts will be set forth as necessary.

Before considering the petitioner's claims, we note the well established precepts that govern our review. "The [ultimate] conclusions reached by the [habeas] court in its decision [on a] habeas petition are matters of law, subject to plenary review. . . . [When] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous. . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. . . . A reviewing court ordinarily will afford deference to those credibility determinations made by the habeas court on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude." (Internal quotation marks omitted.) *Noze* v. *Commissioner of Correction*, 177 Conn. App. 874, 885–86, 173 A.3d 525 (2017).

"In *Lozada* [v. *Warden*, 223 Conn. 834, 842–43, 613 A.2d 818 (1992)], our Supreme Court established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing what is commonly known as a habeas on a habeas, namely, a second petition for a writ of habeas corpus . . . challenging the performance of counsel in litigating an initial petition for a writ of habeas corpus . . . [that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . Nevertheless, the court in *Lozada*, also emphasized that a petitioner asserting a habeas on a

habeas faces a herculean task . . . .” (Internal quotation marks omitted.) *Lebron* v. *Commissioner of Correction*, 204 Conn. App. 44, 50, 250 A.3d 44, cert. denied, 336 Conn. 948, 250 A.3d 695 (2021). “To prevail on an ineffective assistance of habeas counsel claim . . . the petitioner must prove both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . . As to each of these inquiries, the petitioner is required to satisfy the familiar two-pronged test set forth in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. First, the [petitioner] must show that counsel’s performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . In other words, a petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must essentially satisfy *Strickland* twice . . . .” (Internal quotation marks omitted.) *Crawley* v. *Commissioner of Correction*, 194 Conn. App. 574, 581–82, 221 A.3d 849 (2019), cert. denied, 334 Conn. 916, 222 A.3d 104 (2020).

“To satisfy the *performance* prong of the *Strickland* test, the petitioner must demonstrate that his attorney’s representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

“With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel’s errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” (Emphasis added; internal quotation marks omitted.) *Wargo* v. *Commissioner of Correction*, 144 Conn. App. 695, 701–702, 73 A.3d 821 (2013), appeal dismissed, 316 Conn. 180, 112 A.3d 777 (2015).

I

The petitioner first claims that he was prejudiced by Adamo’s and Visone’s failures to argue that Ruane’s and Falk’s decisions not to challenge the instruction provided to the jury at his criminal trial on the intent

element of the charged offenses constituted ineffective assistance of counsel. We disagree.

The following additional facts are relevant to this claim. While instructing the jury on intent, the trial court twice included the definition of general intent, stating that "a person acts intentionally with reference or respect to a result or to conduct described by the statute defining the offense when the person's conscious objective is to cause such result *or to engage in such conduct*"; (emphasis added); but thereafter specified that, to find the petitioner guilty of murder, it must find beyond a reasonable doubt that he killed Williamson "and that he did so with the specific intention of doing so."[5] Immediately preceding this comment, while instructing the jury as to murder, the court explained that the state was required to prove that, in causing Williamson's death, "he did so with the intent to cause her death. In other words, is that what he intended to do, to cause her death?"

After it concluded its instruction on intent, the court instructed the jury, with respect to the crime of attempt to commit murder, that the petitioner "must have acted here with the intent to commit the crime of murder, and specific intent is the intent to kill." The court continued: "It is not enough to show that the [petitioner] acted intending to do some other unspecified criminal act. He must have acted with the same intent, the same state of mind required for the crime of murder which I have just explained to you. I refer you again to my earlier charge on intent and what it means and how it is to be proven and what the intent is that is required for the crime of murder." During its deliberations, the jury sent a note asking the court: "What is intent?" In response, the trial court restated its prior instruction to the jury, which included the definitions of both specific intent and general intent. However, the court finished the instruction by reminding the jury: "Intent can be formed in an instant, but to convict anyone of murder *the intent must be to cause death* . . . ." (Emphasis added.)

The petitioner's trial counsel, appellate counsel, and two previous habeas attorneys did not object to or raise any challenge concerning the court's instructions on intent. In the present case, the habeas court concluded that, although the trial court included the definition of general intent on two occasions in its initial and supplemental intent instructions, the overall instruction did not mislead the jury into believing that it could find the petitioner guilty without finding that he had the specific intent to kill. We agree.

We begin by noting that "[t]he specific intent to kill is an essential element of the crime of murder [and attempt to commit murder]"; *State* v. *DeBarros*, 58 Conn. App. 673, 680, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000); and that "unlawful

restraint in the first degree requires that the defendant had the specific intent to restrain the victim." *State* v. *Williams*, 172 Conn. App. 820, 828, 162 A.3d 84, cert. denied, 326 Conn. 913, 173 A.3d 389 (2017).

General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." As this court has observed, "[t]he definition of intent as provided in § 53a-3 (11) embraces both the specific intent to cause a result and the general intent to engage in proscribed conduct. . . . [I]t is improper for a court to refer in its instruction to the entire definitional language of § 53a-3 (11), including the intent to engage in conduct, when the charge relates to a crime requiring only the intent to cause a specific result. . . . This court has further noted, however, that in cases in which the entire definition of intent was improperly read to the jury, the conviction of the crime requiring specific intent almost always has been upheld because a proper intent instruction was also given." (Internal quotation marks omitted.) *State* v. *Tok*, 107 Conn. App. 241, 269–70, 945 A.2d 558, cert. denied, 287 Conn. 919, 951 A.2d 571 (2008), and cert. denied sub nom. *State* v. *Jourdain*, 287 Conn. 920, 951 A.2d 570 (2008).

*Moody* v. *Commissioner of Correction*, 127 Conn. App. 293, 14 A.3d 408, cert. denied, 300 Conn. 943, 17 A.3d 478 (2011), is instructive in this regard. In *Moody*, the petitioner claimed that his trial counsel rendered ineffective assistance in failing to object to the trial court's decision to instruct the jury on the entire statutory definition of intent, rather than on specific intent only. Id., 303. The petitioner contended that the allegedly improper instruction regarding intent "allowed the jury to find him guilty without finding that he intended to cause the specific result" and asserted that the jury's notes demonstrated this prejudicial impact. Id., 304. While we acknowledged that it is improper for a court to refer in its instruction to the entire definitional language of § 53a-3 (11) for a specific intent crime, we emphasized that reversal of the trial court's judgment is not required when a proper instruction on intent is provided. Id., 305.

In *Moody*, this court noted that the trial court had provided the entire statutory definition of intent to the jury only once in a preliminary and general instruction. See id., 306. As we explained: "Although the court referred back to this instruction three times, it did not repeat the statutory language. Thereafter, the court expressly stated the specific intent element of murder eleven times and assault three times. It also expressly pointed out that specific intent was an element of murder but not of manslaughter in the first degree. Reading the charge as a whole, we do not find it reasonably

possible that the jury was misled. Nor, contrary to the petitioner's assertion, do we conclude that the jury notes demonstrate that the jury was misled. The notes refer to the notion of transferred intent, not the requisite mental state required for culpability." Id. The court concluded that, because the petitioner's claim had no reasonable probability of success on direct appeal, he was not prejudiced by his appellate counsel's failure to raise it. See id.

Although the court in the present case referenced general intent twice in its initial and supplemental charges, those references were followed by correct instructions concerning the specific intent necessary to commit murder. See, e.g., *State* v. *Austin*, 244 Conn. 226, 236, 710 A.2d 732 (1998) (no reversible error when improper intent instruction was followed by numerous proper instructions on elements of murder); cf. *State* v. *Lopes*, 78 Conn. App. 264, 271–72, 826 A.2d 1238 (reversible error when improper intent instruction was given directly in regard to elements of murder and not followed by numerous proper instructions), cert. denied, 266 Conn. 902, 832 A.2d 66 (2003), and cert. denied, 266 Conn. 902, 832 A.2d 66 (2003); *State* v. *DeBarros*, supra, 58 Conn. App. 683–84 (reversible error when improper intent instruction not only was given in initial and two supplemental charges but also was referred to seven additional times).

Our careful review of the court's entire charge persuades us that, as in *Moody*, any possible risk that the jury was misled about the element of intent was eliminated by the trial court's numerous proper instructions on the element of intent in the crimes of murder, attempt to commit murder, and unlawful restraint. Specifically, the court stated to the jury both in its murder and attempt to commit murder charges that, to find the petitioner guilty of these charges, the state must prove beyond a reasonable doubt that he intended to cause the death of Williamson and Kollar. Under the circumstances, we conclude that "[i]t strains reason to believe that the jury could have [understood] the challenged instruction as not requiring that the state prove beyond a reasonable doubt that the [petitioner] intended to kill [the victims]." (Internal quotation marks omitted.) *State* v. *Austin*, supra, 244 Conn. 237. With respect to the unlawful restraint charge, the court also stated during its charge that the state was required to prove beyond a reasonable doubt that the petitioner specifically intended to restrain Kollar. Furthermore, while later instructing the jury as to the petitioner's intoxication defense, the court associated the specific intent required to prove murder and attempt to commit murder with unlawful restraint, stating: "Certainly the crime of murder, attempted murder and unlawful restraint all have a specific intent requirement . . . ." The court added that, if the jury concluded that the petitioner was intoxicated at the time of the offenses, it could take

that fact into consideration in determining whether he was "incapable of forming the required *specific intent*, which is a necessary element for the commission of the various crimes which I have defined for you." (Emphasis added.) Because the petitioner's claim had no reasonable probability of success on appeal, we conclude that the petitioner was not prejudiced by any failure of Adamo and Visone to allege that Ruane and Falk rendered ineffective assistance with respect to that claim in the petitioner's prior proceedings.

## II

The petitioner's second claim is that Adamo and Visone rendered ineffective assistance by failing to challenge Ruane's and Falk's choices not to dispute the trial court's instruction on the affirmative defense of mental disease or defect. The respondent, the Commissioner of Correction, argues that, because no prejudice resulted from the failure to challenge the instruction, the petitioner cannot establish the second prong of *Strickland*. We agree with the respondent.

The following additional facts are relevant to the petitioner's claim. At his criminal trial, the petitioner raised the affirmative defense of mental disease or defect. As our Supreme Court noted in *Kaddah I*, "[the petitioner] adduced testimony establishing that, three months prior to the assaults, his wife had been shot in the chest during a robbery at a convenience store and she had remained hospitalized with serious injuries. He also presented evidence that, one week prior to his arrest, he had been attacked by an unknown individual and that the resulting injury required fifty-two stitches in his back. There was testimony that, on the night in question, the [petitioner] had been drinking heavily and was very upset about the recent loss of his passport." *Kaddah I*, supra, 250 Conn. 577. James Merikangas, a psychiatrist and neurologist called by the petitioner, testified that the petitioner "suffered from brain damage, hypoglycemia, and epilepsy. Merikangas further testified that alcohol interferes with an epileptic's ability to modulate behavior, and that the combination of low blood sugar and alcohol could inhibit the nervous system to the extent that a person 'would not know what he was doing.' " Id. Merikangas further opined that the petitioner's medical conditions "ma[de] it impossible for him to plan, deliberate and act rationally"; and, in his opinion, the petitioner was "literally out of his mind," "was not able to control his conduct," and "did not have an appreciation for what was going on."

During its charge to the jury, the court gave the following instruction on the mental disease or defect defense: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked the substantial capacity as the result of mental disease or

defect to conform his conduct within the requirements of the law." (Internal quotation marks omitted.) The court continued: "There are basically two elements of this affirmative defense: 1. That at the time the [petitioner] was committing the proscribed act he had a mental disease or defect and, 2., that as a result of that mental disease or defect he lacked the substantial capacity to control his conduct within the requirements of the law." The court did not instruct the jury that it also could acquit the petitioner if it determined that, due to mental disease or defect, he lacked substantial capacity "to appreciate the wrongfulness of his conduct." Although the court did not charge the jury with respect to the cognitive prong, the petitioner's trial counsel neither requested such an instruction nor objected to the charge provided by the court at trial, and the petitioner's appellate counsel and two prior habeas attorneys did not raise any claim with respect thereto.[6]

In its memorandum of decision, the habeas court concluded that the evidence of guilt was "overwhelming and uncontroverted, and the evidence the petitioner offered in the way of [his] affirmative defense was insufficient to overcome it." Therefore, the petitioner failed to establish the requisite prejudice from "[a]ny error" in the court's instruction on the mental disease or defect defense. The petitioner now challenges the propriety of that determination.

Our analysis begins with the relevant statute that governs the mental disease or defect defense. General Statutes § 53a-13 (a) provides that, "[i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." As this court has observed, "the affirmative defense of mental disease and defect pursuant to [§] 53a-13 (a), otherwise known as the insanity defense . . . has both a cognitive and a volitional prong. . . . Under the cognitive prong [of the insanity defense], a person is considered legally insane if, as a result of mental disease or defect, he lacks substantial capacity . . . to appreciate the [wrongfulness] of his conduct. . . . Under the volitional prong, a person also would be considered legally insane if he lacks the substantial capacity . . . to [control] his conduct to the requirements of the law." (Internal quotation marks omitted.) *State* v. *Weathers*, 188 Conn. App. 600, 607, 205 A.3d 614 (2019), aff'd, 339 Conn. 187, 260 A.3d 440 (2021).

On our careful review of the record, we conclude that there was not a reasonable probability that, but for the absence of an instruction on the cognitive prong in the petitioner's affirmative defense of mental disease and defect, the result of the proceeding would have

been different. Cf. *Wargo* v. *Commissioner of Correction*, supra, 144 Conn. App. 702. In its memorandum of decision, the habeas court specifically found that Merikangas' testimony was "entirely discredited during the state's [cross-examination]."[7]

Our own review of the state's cross-examination supports the habeas court's conclusion. First, Merikangas admitted that, before he met or evaluated the petitioner, he authored a letter to the petitioner's counsel, stating that, after listening to the petitioner's police interrogation, he believed that the petitioner had been " 'coached' " in advance by the police. Merikangas also admitted that, when he interviewed the petitioner, he met with him for only ninety minutes and never asked the petitioner: (1) for a mental health or medical history, (2) what, if anything, he remembered about the events of August 27, 1994, or (3) if he had, in fact, been coached by the police, as Merikangas initially believed. Moreover, Merikangas conceded that the petitioner was "an overachieving student and athlete through high school," had obtained college credits, and always held regular employment, despite his brain damage. Most tellingly, Merikangas was unable to identify any medical evidence that either hypoglycemia or an epileptic seizure was connected to homicidal behavior.[8] Thereafter, the state offered Karen Brody, a psychiatrist, as a rebuttal witness, who contradicted Merikangas' opinion. See *Kaddah I*, supra, 250 Conn. 577–78. The jury thus was left to determine which of the two experts it believed—a proverbial battle of the experts.

Although the habeas court did not have the opportunity to evaluate the demeanor of either Merikangas or Brody on the witness stand, it remains the exclusive province "of the habeas court, as the trier of fact, to consider, sift, and weigh all the evidence" before it. (Internal quotation marks omitted.) *Houghtaling* v. *Commissioner of Correction*, 203 Conn. App. 246, 279, 248 A.3d 4 (2021). It is axiomatic that the habeas court's proper review of the evidence necessarily includes its review of the transcripts of a petitioner's criminal trial. See, e.g., *Chase* v. *Commissioner of Correction*, 210 Conn. App. 492, 500, 270 A.3d 199 (2022) (court relied in part on petitioner's criminal trial transcripts to assess trial counsel's performance and strategic choices). In its review of the record, which included the challenges to Merikangas' credibility and the ultimate outcome reached by the jury, the court reasonably determined that Merikangas' opinion was likely not perceived as credible to the jury. Accordingly, the court's finding that Merikangas' testimony was "thoroughly discredited" on cross-examination is not clearly erroneous.

Moreover, we reiterate that, as this court has held, "[i]n making [the] determination [of whether counsel's performance resulted in prejudice at a petitioner's criminal trial], a court hearing an ineffectiveness claim must

consider the totality of the evidence before the judge or the jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Internal quotation marks omitted.) *Antwon W.* v. *Commissioner of Correction*, 172 Conn. App. 843, 870–71, 163 A.3d 1223, cert. denied, 326 Conn. 909, 164 A.3d 680 (2017); see also *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 688, 51 A.3d 948 (2012) ("In order to prevail on a claim of ineffectiveness of counsel, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [T]he question is whether there is a reasonable probability that, absent the [alleged] errors, the [fact finder] would have had a reasonable doubt respecting guilt." (Citation omitted; internal quotation marks omitted.)).

Given the substantial evidence in support of the petitioner's guilt and the aforementioned challenges to the petitioner's expert witness' credibility, we cannot conclude that, but for trial counsel's failure to request the petitioner's preferred instruction, there is a reasonable probability that the petitioner would not have been convicted. See *Anton W.* v. *Commissioner of Correction*, supra, 172 Conn. App. 872 (in light of "totality of the evidence admitted in the petitioner's criminal trial," possible instructional error "had no effect on the jury's decision to credit" relevant testimony).

Accordingly, the habeas court properly determined that, regardless of trial counsel's actions with respect to the language omitted in the instruction on the affirmative defense of mental disease or defect, the outcome of the petitioner's criminal trial would not have differed in any way. For that reason, the habeas court properly concluded that the petitioner failed to meet his burden with respect to the prejudice prong of *Strickland*.

The judgment is affirmed.

In this opinion the other judges concurred.

¹ We note that the petitioner's first name has been spelled "Nabil" in other appellate decisions. See *Kaddah* v. *Commissioner of Correction*, 299 Conn. 129, 130, 7 A.3d 911 (2010); *State* v. *Kaddah*, 250 Conn. 563, 564, 736 A.2d 902 (1999); *Kaddah* v. *Commissioner of Correction*, 105 Conn. App. 430, 431, 939 A.2d 1185, cert. denied, 286 Conn. 903, 943 A.2d 1101 (2008). In the present case, we use the spelling "Nabeel" for consistency with the

pleadings. See *Kaddah* v. *Commissioner of Correction*, 324 Conn. 548, 551 n.1, 153 A.3d 1233 (2017).

[2] The petitioner was convicted of murder in violation of General Statutes § 53a-54a, attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, and unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a). *State* v. *Kaddah*, supra, 250 Conn. 564.

[3] The petitioner also filed a series of unsuccessful habeas petitions in federal court; see *Kaddah* v. *Brighthaupt*, United States District Court, Docket No. 3:11-cv-1809 (SRU) (D. Conn. August 6, 2013); *Kaddah* v. *Lee*, United States District Court, Docket No. 3:08cv519 (SRU) (D. Conn. October 7, 2008); *Kaddah* v. *Strange*, United States District Court, Docket No. 3:00CV1642 (CFD) (D. Conn. January 18, 2001); which do not affect our analysis in this appeal.

[4] We note that the operative pleading with respect to the third habeas petition includes six counts claiming ineffective assistance of counsel in connection with the criminal trial, the direct appeal, and the two prior habeas petitions. On the first day of trial, the habeas court, acting sua sponte, dismissed counts one, two, four, and five of the amended petition, which alleged ineffective assistance of counsel in connection with the criminal trial and the direct appeal but did not pertain to prior habeas counsel. See *Kaddah* v. *Commissioner of Correction*, 324 Conn. 548, 551–52 n.4, 153 A.3d 1233 (2017). The petitioner does not challenge the propriety of this decision on appeal to this court.

[5] The court's instruction to the jury was as follows: "I am now going to define for you under Connecticut law what intent is. I am going to read this definition only one time to you, although it will apply many times during the balance of this charge because at least five of these crimes or lesser included offenses require an intent element, and therefore this definition that I am going to give you will apply whenever you hear the word 'intent' or whenever you hear an element of a specific intent to do something.

"This is the definition we are talking about. . . . Our statute provides that a person acts intentionally with reference or respect to a result or to conduct described by the statute defining the offense when the person's conscious objective is to cause such result *or to engage in such conduct*. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent.

"Now intent is a mental process. Intention can only in most cases be proven by the actions and statements of the person whose acts are being examined. No one can be expected to come into court and testify that he looked into another person's mind and saw therein a certain intention. It is often impossible and never necessary to prove criminal intent by direct evidence.

"Intent may be and usually is proven by the circumstantial evidence as I have explained that term to you. Therefore, one way in which the jury can determine what a person's intention was at any given time is first by determining what the person's conduct was, including any statements he or she made and what circumstances were surrounding that conduct, and then from that conduct and those circumstances inferring what his or her intention was.

"In other words, a person's intention may be inferred from his conduct. You may infer from the fact that the [petitioner] engaged in conduct, that he intended *to engage in that conduct*. You should infer such conduct only if you are satisfied of it beyond a reasonable doubt.

"This inference is not a necessary one. That is, you are not required to infer intent from the accused's conduct, but it is an inference that you may draw if it is reasonable and a logical inference. I remind you that the burden of proving intent beyond a reasonable doubt is always upon the state.

"Do not be confused by the word 'intent.' It does not require any specific length of time to form an intent. Intent can be formed in an instant, but *to convict anyone of murder the intent must be to cause death*, and in summary in order for the accused to be found guilty of murder, you must find proven beyond a reasonable doubt that the [petitioner] killed Jennifer Williamson and that *he did so with the specific intention of doing so*." (Emphasis added.)

[6] We note that the petitioner acknowledges in the present petition that the two prongs of the mental disease or defect defense are disjunctive but alleges deficient performance because, if counsel had requested a charge on the cognitive prong, the trial court would have been required to give that instruction based on the evidence. Although the petitioner does not claim that trial counsel was deficient in pursuing the defense based on the volitional prong, the petitioner nevertheless argues that there was no strate-

gic reason for failing to seek an instruction on the cognitive prong. Because the habeas court did not make any factual findings as to the petitioner's claim of deficient performance, we do not address the question of whether the decision not to challenge Ruane's and Falk's actions with respect to the trial court's instructions constituted deficient performance on the part of Adamo or Visone. See, e.g., *Small* v. *Commissioner of Correction*, 286 Conn. 707, 716, 946 A.2d 1203 ("[w]hen the record on appeal is devoid of factual findings by the habeas court as to the performance of counsel, it is improper for an appellate court to make its own factual findings"), cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

[7] The petitioner contends that this was an improper credibility determination on the part of the habeas court because Merikangas did not testify during the habeas trial and, as a result, the habeas court was not able to evaluate Merikangas' demeanor. Because it is undisputed that the parties had stipulated to the use of transcripts and exhibits, which constituted the entirety of the evidence before the court, it is self-evident that the court could not make a credibility determination. Thus, although the habeas court used the term "discredited" in discussing the state's cross-examination, we construe this statement more appropriately as reflecting the court's finding as to the value of that testimony after considering and weighing Merikangas' testimony in the context of the court's review of the record, which finding is subject to the clearly erroneous standard of review. See, e.g., *Noze* v. *Commissioner of Correction*, supra, 177 Conn. App. 885–86.

[8] We additionally note that, during the prosecutor's cross-examination of Merikangas, the following colloquy occurred:

"[The Prosecutor]: [Quoting the petitioner's testimony from the taped interview with the inspector] 'We start to talk before she took her clothes off. Then, I don't know. I was driving. I stop. I park my car. I don't know where, and remove to the back seat with her. She took off her clothes. I don't know. I tried to kiss her or something. Also, she ask me about money, and I told her the same thing. I don't—I—I don't pay money for sex. Maybe I told her. I don't know exactly, but because I know I don't pay money for sex. I try to make sex with her. She doesn't want. Then I don't know how she hit me in my eyes, and this moment I feel pain in my eyes. I don't remember. I hit her, and she bite me.' Are you suggesting that that short area is something that [the petitioner] would have memorized based upon what police officers had told him before they turned the tape on?

"[Merikangas]: No. . . .

"[The Prosecutor]: You have testified, Doctor, that having heard the audiotape, it was in fact played to the jury earlier, that in your opinion the [petitioner] was on that day actually unable to tell the police what had happened?

"[Merikangas]: The part you read to me had a dozen 'I don't know's' in it, and that is my opinion, that he was not able to give an accurate description of what happened.

"[The Prosecutor]: You would consider anything he might have to say reliable if it could be . . . verified by independently acquired information?

"[Merikangas]: I wouldn't consider it reliable as an index of his actual thought processes and memory. There may be parts of it that are corroborated. . . .

"[The Prosecutor]: For instance, Doctor, [the petitioner] on the tape tells the police that both victims left his car naked leaving their clothing in his car.

"[Merikangas]: Well, I think that there was clothing in his car. . . .

"[The Prosecutor]: It turns out that their clothing was found in his car.

"[Merikangas]: Well, that's how he knew the clothing was in his car. They found the clothing in his car.

"[The Prosecutor]: That would not—that would indicate to you, Doctor, would it not, that he could recall that fact they left his car naked; they left their clothes in his car?

"[Merikangas]: No, I wouldn't draw that conclusion.

"[The Prosecutor]: Doctor, [the petitioner] on that tape told the police that he had been drinking two different brands of beer—

"[Merikangas]: Right.

"[The Prosecutor]: —Budweiser and Miller?

"[Merikangas]: Right.

"[The Prosecutor]: When the police officers actually removed the Budweiser and Miller from that car just in March of this year, it turns out it is Budweiser and Miller. Would that not indicate to you when he spoke to the police on that tape he was able to recall the brands of beer he was drinking?

"[Merikangas]: That's possible.

"[The Prosecutor]: [The petitioner], Doctor, on the tape told the police that he bit the homicide victim, and he pointed out the location on her body where he bit her. It turns out, when her body is found lying on the street by the police officers, that she has bite marks right just about right where [the petitioner] said you could find them. Wouldn't that indicate that when he was speaking to the police he could recall that segment of what he had done?

"[Merikangas]: I don't recall the interaction around that particular seg-

ment. . . . I don't see that kind of thing on the tape. I think the jury has heard this tape if you say they heard it. . . .

"[The Prosecutor]: . . . Would that not indicate that he could in fact recall where he bit her?

"[Merikangas]: It could indicate that.

"[The Prosecutor]: The [petitioner] told the police when he departed the first crime scene where there was a surviving victim, and describing it he said there were some bushes up in the vicinity of the car. That's on the tape. It turns out that when the [petitioner's] car is seized, some of those bushes are hanging on the car. Would that not indicate he could recall at least that much of what had occurred?

"[Merikangas]: Apparently it would, yes."